**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

PRESTON LAWLEY,

      Plaintiff,

CASE NO. 11-12822
HON. LAWRENCE P. ZATKOFF

v.

ALLAN JERRY SIEMONS,

      Defendant.

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on March 13, 2013.

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This Opinion and Order constitutes the findings of fact and conclusions of law of the Court following a bench trial in this matter.  For the reasons set forth below, the Court concludes that Plaintiff has failed to satisfy his burden of proof in this matter.  The Court awards Judgment in favor of Defendant and against Plaintiff.

## II. BACKGROUND

### A. PROCEDURAL HISTORY

This case arises from Defendant's alleged breach of an oral contract between Plaintiff and Defendant.  Plaintiff alleges that the oral contract involved Defendant's promise to pay a portion of the proceeds Defendant would receive for redemption of Defendant's shares of stock

in Event Solutions International, Inc. ("ESI") in exchange for Plaintiff introducing Defendant to business contacts in 1998 and approving Defendant's ownership interest in ESI.

On June 30, 2011, Plaintiff filed his complaint against Defendant, seeking 50% of the proceeds Defendant received for redemptions of his shares of stock in ESI. Plaintiff asserted three counts: (I) breach of an express oral contract; (II) breach of an implied contract; and (III) unjust enrichment.

Defendant filed a motion to dismiss all three counts in Plaintiff's complaint on September 28, 2011. In its November 30, 2011 Opinion and Order, the Court dismissed counts I and II because Defendant's alleged promise to pay Plaintiff 50% of his stock redemption proceeds was not supported by sufficient legal consideration. The Court did find, however, when reviewing the complaint in the light most favorable to Plaintiff, that Plaintiff's unjust enrichment claim was sufficiently pled to survive Defendant's motion.

On January 22, 2013, the Court commenced trial on Plaintiff's remaining claim for unjust enrichment. Trial continued through January 25, 2013, at which time both parties requested a recess. Trial resumed, and concluded, on February 5, 2013.

During the course of trial, four (4) witnesses were called to testify and 78 exhibits were offered to, and received by, the Court. Additionally, the Court considered and reviewed the parties' written submissions, including a joint final pretrial order and trial briefs containing proposed findings of fact and conclusions of law, the parties' opening statements and closing arguments, and updated briefs after the trial concluded.

## B. PLAINTIFF'S REMAINING CLAIM

Plaintiff's surviving count against Defendant is a claim for unjust enrichment. As stated in Plaintiff's Complaint, Plaintiff asserts that he "enriched" Defendant by (1) introducing him to

2

business contacts and (2) approving Defendant's "award" of a 30% interest in ESI.  *See* Dkt. # 1,

¶¶ 7, 9, 32.  In exchange for these purported benefits, Defendant allegedly paid no compensation

or provided no services to ESI, and therefore unjustly received said benefits.  *See id.* at ¶¶ 32, 34.

## C. BURDEN OF PROOF

In order to prove a claim for unjust enrichment, a plaintiff must prove the following

elements by a preponderance of the evidence: (1) receipt of a benefit by the defendant from the

plaintiff; and (2) an inequity resulting to the plaintiff because of the retention of the benefit by

the defendant.  *Barber v. SMH (US)*, 202 Mich. App. 366, 375 (1993).  To establish "by a

preponderance of the evidence" means to prove that something is more likely so than not so.  In

other words, a preponderance of the evidence means "such evidence as, when considered and

compared with that opposed to it, has more convincing force, and produces in [the trier of fact's]

mind belief that what is sought to be proved is more likely true than not true."  *Williams v. Eau

Claire Public Sch.*, 397 F.3d 441, 446 (6th Cir. 2005).

## D. ATTORNEYS' CONDUCT

The Court will briefly comment on the conduct of both parties' attorneys during trial.

Counsel for Plaintiff and Defendant were well versed and diligent in their preparation in advance

of trial.  The Court was especially impressed with counsel's familiarity with the subject matter

involved in this case, their zealous advocacy on behalf of their clients, their understanding, and

presentation of, the exhibits, and their overall courteousness to the witnesses, the Court, and its

staff.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

At trial, the following witnesses were called: (1) Plaintiff; (2) Ben Giovanelli

("Giovanelli"); (3) Kevin Otis ("Otis"); and (4) Defendant.  Both parties also introduced

3

numerous exhibits for the Court's consideration.  As to the credibility of the witnesses, the Court, as the fact finder, was guided by the appearance and conduct of the witnesses, by the manner in which they testified, and by the character of the testimony given.  The Court had an opportunity to view the witnesses' reactions to questions, their hand and eye movement, and their facial expressions.  Additionally, the Court considered the witnesses' intelligence, motive, state of mind, demeanor, and manner while testifying.  The Court also considered each witness's ability to observe the facts to which he testified and whether he appeared to have an accurate recollection of the relevant circumstances.

## A. FINDINGS OF FACT

The Court finds the following, based upon the witnesses' testimony, the facts stipulated to by the parties, the facts already determined by the Court, and the evidence submitted at trial.

## 1. EVENTS PRIOR TO FORMATION OF ESI

Plaintiff has been involved in various aspects of the automobile industry for the course of his career.  Equipped with nothing more than an eleventh grade education, he initially was a trained automobile body mechanic who, at one period, owned three repair shops.

Plaintiff was hired by a company called A&M Logistix, Incorporated ("A&M") in 1988 as a sales and events manager.  A&M principally organized event and training services for automotive companies—such as General Motors and Chrysler—and dealerships to assist in the marketing of their automobiles.  A&M had a bifurcated business plan, with one division providing logistics services—the division Plaintiff was associated with—and the other providing fleet management services.  As part of his employment with A&M, Plaintiff would organize, oversee, and manage comparative vehicle testing events for the automotive companies.  At these events, commonly referred to in the industry as "ride and drive events", an automotive company

4

would host dealership salespersons, consumers, and others involved in the automotive industry for all-day events during which the company trained and educated its employees on its own vehicles as well as its competitor's vehicles, providing a discernable basis of comparison.

During the mid-1990's, Plaintiff and Defendant were business acquaintances.  Defendant owned Budget Rent-a-Car of Beverly Hills, California, a business that, among other things, supplied vehicles for comparative vehicles testing events.  Because Defendant had a reputation of procuring "hard-to-get" vehicles, *i.e.*, luxury brands or foreign models, Plaintiff occasionally contracted Defendant's business to supply vehicles for A&M's events.   This business relationship continued throughout the mid-1990's.  During this time, Plaintiff and Defendant's business relationship evolved into a personal friendship.

On August 7, 1997, Plaintiff was terminated from A&M after refusing a retirement package offer.  In accordance with Plaintiff's employment contract, A&M sought to enforce the non-compete covenant (hereinafter referred to as "non-compete clause"), which would have effectively barred Plaintiff from obtaining any type of employment in the logistics and event industry for a period of two years.  A&M also fired other top employees who were "sympathetic supporters" of Plaintiff.

Shortly after Plaintiff's termination, Plaintiff and Defendant had several telephone conversations about forming a new company similar to A&M.  It was during these initial conversations that Defendant informed Plaintiff about Elliot Broidy ("Broidy"), a venture capitalist—and business contact of Defendant—with whom Defendant would discuss funding for their budding business plan.

Additionally, because Plaintiff had no working income due to his firing from A&M, Defendant offered, and subsequently loaned, Plaintiff $50,000.00—half of which was to be

5

utilized to finance a legal challenge to the non-compete clause,[1] with the other half intended for living expenses—as memorialized in a letter dated August 21, 1997. *See* Trial Ex. 36, August 21, 1997, Letter from Defendant to Plaintiff.[2] Notably, the letter also indicated that Defendant was willing to loan Plaintiff additional funds if necessary, and would offer Plaintiff a monthly revolving line of credit. *See id.* In fact, Defendant loaned Plaintiff an additional $25,000.00.

In early December 1997,[3] while Plaintiff's case against A&M was pending, Plaintiff traveled to California to further discuss with Defendant the formation of a new logistics and event company. As of December 13, 1997, and as evidenced by a letter bearing the same date, Defendant had spoken to Broidy and he (*i.e.*, Broidy) was "very interested" in Plaintiff and Defendant's business venture. *See* Trial Ex. 38A, December 13, 1997, Letter from Defendant to Plaintiff. Defendant had also sought advice on how to structure this business from his current tax accountant/attorney, Blair Stover ("Stover"). Stover would later provide tax and accounting services to ESI after the company was formed. *See id.*

On January 9, 1998, at Plaintiff's invitation, Defendant and Broidy accompanied Plaintiff to the charity preview of the North American International Auto Show in Detroit, Michigan. The very next day, Plaintiff, Defendant, and Broidy convened at the Townsend Hotel in Birmingham, Michigan. Impressed by Plaintiff and his industry connections, Broidy agreed to provide the initial working capital to launch the business. Plaintiff testified during trial that, but

---

[1] On September 9, 1997, Plaintiff filed a complaint against A&M seeking a declaration that the above-mentioned non-compete clause be ruled unenforceable. There was a common understanding between Plaintiff and Defendant that if the non-compete clause was ruled unenforceable, they planned to start a new business endeavor.

[2] The Court notes that enclosed in the letter was a promissory note that Plaintiff was to sign and return to Defendant. Thus, Defendant loaned Plaintiff money without first having Plaintiff sign that note. Further, the letter evidences Defendant's intent to procure a meeting between himself, Plaintiff, and Bill Felton—who was one of Defendant's business contacts in Boston.

[3] Plaintiff testified that in December 1997 he individually met with Broidy for the first time, though he could not recall a specific date at trial.

6

for Defendant's introduction of Broidy to Plaintiff, he would never have met Broidy.

On January 16, 1998, Judge Corbett O'Meara of this District declared the non-compete clause of Plaintiff's agreement with A&M to be unenforceable. *See* Trial Ex. 26, January 16, 1998, Opinion and Order.

**2. ESI**: **1998–2002**

Upon learning that the non-compete clause was void, Plaintiff almost immediately took action to secure event contracts. By late January 1998, Chrysler awarded Plaintiff a contract, and a BMW contract was being negotiated.[4] Around that same time, corporate documents were filed and ESI was officially incorporated on January 27, 1998, in Nevada. *See* Trial Ex. 1B, Nevada Certificate of Existence.

Plaintiff contacted Broidy a few weeks after Judge O'Meara's ruling explaining that, because ESI had entered into a contract with Chrysler, and because BMW wanted confirmation that ESI was financially sound, the company required a prompt influx of working capital. On February 20, 1998, Broidy extended to ESI a revolving line of credit in an amount up to $500,000.00 to fund its working capital requirements, with the terms and conditions set forth in a Commitment Letter sent from Broidy to ESI. *See* Trial Ex. 2A, February 20, 1998, Commitment Letter from Broidy to ESI. Plaintiff, acting as ESI's president, executed a promissory note to Broidy agreeing to the terms of the loan, which included an annual interest rate of 8%. *See* Trial Ex. 2B, February 20, 1998, Promissory Note. Aside from Broidy's financial backing, no additional start-up money was committed by Plaintiff or Defendant.

Plaintiff entered into an Executive Employment Agreement with ESI on February 9,

---

[4] BMW was concerned with awarding a large project to ESI, a corporation still in its embryonic stage. *See* Trial Ex. 40A, March 28, 1998, Letter from Defendant to Broidy Capital. In order to secure the BMW account, Defendant offered to co-sign a $500,000 promissory note to Bank of America, which would have alleviated BMW's concerns over money issues. *See id.*

1998, wherein he was named President and CEO.[5]   *See* Trial Ex. 21B, Executive Employment Agreement.   The employment agreement included a five-year term and provided for an annual base salary of $180,000.00.   In accordance with paragraph four (4) of the agreement, titled "Executive's Expenses", Plaintiff would be reimbursed for "reasonable and necessary expenses" when directly performing his duties, with such expenses including those incurred in furtherance of ESI's business in Detroit.[6]   Because ESI never opened corporate credit cards, Plaintiff was to charge these business expenses to his personal American Express credit card.   To receive reimbursement Plaintiff would mark "personal" or "business" on his American Express bill as a way to distinguish between reimbursable and non-reimbursable expenses, and would then furnish the bill to his secretary, who filled out a corporate request form for reimbursement.

In the first week of March 1998, a little more than a month after the company was incorporated, Plaintiff, Defendant, and Broidy met at Broidy's California office to develop a corporate ownership structure.   Broidy first suggested that the company ownership be divided equally, with Plaintiff, Defendant, and Broidy each having a one-third (1/3) interest.   But, because Plaintiff wanted to give a portion of his shares to his former colleagues at A&M—who were now employed by ESI—Broidy ultimately proposed that the three founders acquire a 30% interest in the company, with the residual 10% dispersed among other ESI employees.   It is undisputed that Plaintiff, Defendant, and Broidy all agreed to this ownership structure during this meeting and such assent is later confirmed by the minutes from ESI's first Board of Director's

---

[5] The recitals of this agreement state that ESI "desires to employ [Plaintiff] to receive the benefits of his knowledge, reputation and contacts in the industry and to retain the services of [Plaintiff] for [ESI][.]"   *See* Trial Ex. 21B, Executive Employment Agreement.

[6] Plaintiff was from, and lived in, Alabama during his employment with ESI.   Because he maintained his residence in Alabama, Plaintiff traveled to Detroit weekly and stayed for approximately three to four days in an apartment provided by ESI.   There was an understanding between ESI and Plaintiff that these travel expenses (*i.e.*, airline tickets and apartment) would be paid by ESI.

8

meeting.[7]  Also discussed during the meeting were their respective roles and or duties to ESI. Plaintiff would essentially "run" the company and serve as its CEO and president, Defendant would be Broidy's "eyes and ears in Detroit" and would hire a financial team to manage ESI's accounting records and oversee the daily fiscal activities,[8] and Broidy was the financier.  All three were Directors of ESI, yet neither Defendant nor Broidy was an employee of the company.

With ESI's corporate formalities in place, Plaintiff was able to focus on attaining new clients and keeping ESI's current customer base satisfied.  At somewhat of an unprecedented rate in the industry, the company immediately realized exponential revenue growth.  As illustrated by ESI's statement of earnings, revenues for 1998 and 1999 were approximately $15 million and $15.5 million, respectively.  *See* Trial Ex.'s 7A, B, and C, Statements of Earnings.

ESI's success did not go unnoticed.  In June 1999, Sports Capital, a division of IMG Worldwide,[9] sought to acquire an ownership interest in ESI.  For a 70% interest, Sports Capital proposed a purchase price of approximately $10 million.  A letter dated June 4, 1999, drafted by Defendant and addressed to Broidy, outlined Defendant's thoughts and issues involving this potential acquisition.  Ultimately, Defendant recommended that ESI try to reach a deal with IMG, despite admitting that the proposed purchase price was "very cheap".  Defendant also indicated in the letter that he would abstain from voting on this matter.  *See* Trial Ex. 41, Review of Sports Capital Proposal.  In the end, no deal was consummated between ESI and Sports

---

[7] In the minutes of the first meeting of the Board, this ownership structure is memorialized and signed by Plaintiff, Defendant, and Broidy.  The minutes indicate that the three Directors—Plaintiff, Defendant, and Broidy—each received 300,000 shares of common stock in ESI.  The minutes are dated January 27, 1998.  It was revealed at trial that the minutes were back-dated because the 30% ownership agreement was not yet in place as of that date.  *See* Trial Ex. 39, Minutes of the First Meeting of Board.

[8] These services were provided, in part, by Stover and his accounting firm.  Additionally, Defendant hired Giovanelli to serve as comptroller and financial officer to ESI in 1999.  Giovanelli would later become ESI's Chief Financial Officer ("CFO").

[9] IMG Worldwide is a global sports, fashion and media business, with nearly 3,000 employees operating in over 30 countries around the globe.

2:11-cv-12822-LPZ-RSW   Doc # 46   Filed 03/13/13   Pg 10 of 28   Pg ID 343

Capital.

In November 1999, ESI's Board extended to Plaintiff a founder's revolving line of credit for an amount up to $300,000.00, payable on demand. *See* Trial Ex. 4A, Founder's Revolving Line of Credit; Ex. 4B, Board Resolution. This transaction occurred for two reasons. First, Plaintiff needed the financial means to support his extensive travel and entertainment expenses.[10] Plaintiff was considered the "face" of ESI and it was his obligation to foster its growth—an obligation that required repeated travel and entertaining of prospective and or new clients. Second, Plaintiff apparently exhausted his savings accounts to purchase a new house and contest the non-compete clause, both of which left him "broke".

Eventually, in early 2000, the revolving credit line that Broidy tendered to ESI was replaced with a $5 million line of credit from Comerica Bank. Plaintiff, Otis,[11] and Pete Taylor ("Taylor")[12] were guarantors of that loan.

On March 1, 2000, a Stock Buy-Sell Agreement was entered into between ESI and, among other signatories, Plaintiff, Defendant, and Broidy.[13] Paragraph six (6) of this agreement accorded to ESI the option to purchase all or any portion of the stock owned by a terminated employee. The purchase price of the stock was to be computed as follows: the purchaser, *i.e.*, ESI, would pay an amount equal to the lesser of the certificate of agreed value or the fair market value.[14] A down payment equal to 20% of the purchase price would be made initially, with the remaining balance to be amortized over four (4) years. *See* Trial Ex. 5, Stock Buy-Sell Agreement. It was admitted during trial by Plaintiff, Defendant, Giovanelli, and Otis that ESI

---

[10] Plaintiff testified that he flew 150,000 miles per year and drove 45,000 miles per on behalf of ESI.
[11] Otis was Executive Vice-President of ESI as of early 2000.
[12] Taylor was Secretary and Treasurer of ESI as of early 2000.
[13] Otis and Giovanelli were also signatories to March 1, 2000, Stock Buy-Sell Agreement.
[14] The fair market value was to be calculated according to an appraisal *or* by mutual agreement of the parties to the sale. *See* Trial Ex. 5, Stock Buy-Sell Agreement.

10

neither executed a certificate of agreed value nor hired a qualified appraiser to value the company's stock at any time during the course of events giving rise to this litigation.

Building on its prior success, 2000 and 2001 proved to be even more financially lucrative for ESI with revenues close to $30 million in both years.

On July 19, 2002, Defendant and Broidy entered into a Stock Assignment Agreement. Defendant assigned his shares in ESI—at that time, 750,000 shares—as collateral to Broidy for Broidy's agreement to serve as guarantor of Defendant's $500,000 loan from Bank of America. *See* Trial Ex.'s 8A–I, Documents evidencing Defendant's loan and Stock Assignment Agreement. ESI's stockholders approved this transaction on July 19, 2002. *See* Trial Ex. 8J, Written Consent of Stockholders.

In late 2002, ESI, along with its various sister companies, were rolled into a parent entity, Event Solutions International Holdings, Inc ("ESI Holdings"). *See* Trial Ex.'s 6A–D, Corporate documents establishing ESI Holdings. The company continued to conduct business, and be known as, ESI. Despite experiencing financial distress during 2002,[15] ESI's projected financial outlook for 2003 was promising.

**3. ESI: 2003**

    **a. Events Leading Up to July 17, 2003, Meeting**

On January 10, 2003, ESI held its regular meeting of the Board. *See* Trial Ex. 9A, January 10, 2003, Minutes of Board Meeting. In attendance were the following: Plaintiff,[16] Defendant, Broidy, Taylor, Otis,[17] Giovanelli,[18] Gerald Woycik ("Woycik"),[19] William Gilbride,

---

[15] According to Plaintiff, ESI's financial growth was somewhat stymied by the 9/11 terrorist attacks.

[16] Plaintiff now served only as Chief Executive Officer of ESI, and was reelected to that position during the January 10, 2003, Board meeting.

[17] Otis was now President of ESI, and was reelected to that position during the January 10, 2003, Board meeting.

Jr. ("Gilbride"),[20] Sean Fraser ("Fraser"),[21] and Stover.  During the meeting, Plaintiff reported that ESI had positioned itself in the industry as a Tier 1 supplier.  It was also motioned by the Board, and unanimously agreed upon, that Plaintiff, Giovanelli, and Otis's employment contracts would be renewed on substantially the same terms as their previous contracts, except the new contracts included three-year terms.[22]

Plaintiff signed his second Executive Employment Agreement with ESI on February 1, 2003.  *See* Trial Ex. 10, Executive Employment Agreement.  Though this agreement contained an expense reimbursement provision, it was modified from Plaintiff's first employment agreement and instead granted reimbursement for "all reasonable and necessary expenses incurred by [Plaintiff] in the direct performance of his duties, upon presentation of an itemized account of such expenditures and subject to substantiation as may be required by . . . the IRS."  Devoid from this provision was explicit mention of Plaintiff's expenses incurred in Detroit.  This agreement also included a $40,000 annual salary increase, a just cause termination clause, and a six-month non-compete covenant.

In early 2003, ESI and its related companies, ES3, Inc. ("ES3") and ClearDrive, Inc. ("ClearDrive"),[23] underwent "growing pains."[24]  Plaintiff hired Andrew McGreer ("McGreer"), a

---

[18] Giovanelli was the current CFO of ESI, and was reelected to that position during the January 10, 2003, Board meeting.

[19] Woycik was Vice President of ESI, and was reelected to that position during the January 10, 2003, Board meeting.

[20] Gilbride and Fraser served as ESI's corporate counsel.

[21] *See* note 19, *supra*.

[22] It was agreed by the Board during this meeting that Taylor's employment contract would not be renewed or extended.  Instead, Taylor would be given a period of time in which he was to prove his value to the company.  Also, the Board agreed to terminate Andy Pasqua's employment as he had become a "severe detriment" to ESI.  *See* Trial Ex. 9A, January 10, 2003, Minutes of Board Meeting.

[23] ES3 and ClearDrive were established to offset ESI's costs.  In the past, ESI engaged a third party's services to provide sales training (now provided by ES3) and professional drivers (now provided by ClearDrive) at their events.  With the advent of these two companies, however, ESI no longer had to hire out for those services and could more effectively curb its overall costs.  Plaintiff and Broidy each held a 30% interest in ES3 and ClearDrive.  Defendant was uninvolved in either company.

consultant from Alabama, to help quiet this business turmoil. McGreer, however, turned out to be a detriment to the companies. Though not fully vetted out at trial, McGreer's actions caused nothing but "managerial disputes" among ESI, ES3, and ClearDrive. One of the known issues on McGreer's agenda was cost control. He requested that Giovanelli produce an analysis on "areas that needed immediate cost control". In an undated report, Giovanelli identified five (5) areas that, if controlled, could save ESI money—one such area was Plaintiff's expense spending, which Giovanelli estimated at 145% of his annual salary. *See* Trial Ex. 46, Undated Report from Giovanelli to McGreer.

Giovanelli and Otis separately described at trial their perception of ESI's internal working environment around the time that McGreer was brought in. Beginning in the early months of 2003 and approaching June of that year, Giovanelli testified that ESI was "unraveling" as a result of "great turmoil" and "great dysfunction" within the company. Otis was more pointed on what he thought was causing ESI's distress. Otis was under the impression that "either the Plaintiff had to go or [I] had to go." According to Otis, ESI would be in a "better place" without Plaintiff and viewed Plaintiff's separation from ESI as a "good thing" for the company.

On June 7, 2003, ESI conducted a regular meeting of the Board in Lake of Ozarks, Missouri. *See* Trial Ex. 11, June 7, 2003, Minutes of Board Meeting. The following persons participated in that meeting: Plaintiff, Defendant, Broidy,[25] Gilbride, Otis, Giovanelli, Woycik, Larry Taulbee ("Taulbee"),[26] and Stover. Plaintiff boasted during the meeting that, since the inception of ESI approximately five and a half years ago, the company had generated

---

[24] It is not entirely clear to the Court what sparked the dispute between ESI and its related companies. The Court presumes, and testimony from trial implicitly suggests, that ESI was expanding too expeditiously.
[25] Broidy participated via telephone.
[26] Taulbee was the interim Chief Operating Officer ("COO") of ESI.

approximately $100 million in revenue.  Adding to that, Otis reported that ESI had $40 million of work already under contract for the 2003 calendar year, and approximately another $2 million projected before the year end.[27]

Two additional items discussed during the June 7, 2003, Board meeting merit attention. First, Gilbride reported that Defendant had repaid his loan to Bank of America, thus fulfilling the Stock Assignment Agreement he entered into with Broidy.  Second, ESI would exercise its right to redeem the shares of its terminated employees—Taylor and Pasqua—at a purchase price of $1.00 per share.

### b. PLAINTIFF SEPARATES FROM ESI

On July 17, 2003, in Gilbride's office in Detroit, Plaintiff was given a letter from Defendant and Broidy that placed Plaintiff on a paid "indefinite administrative suspension" as a result of "apparent violations of Company policies and procedures".  *See* Trial Ex. 15, July 17, 2003, Letter.  As revealed through trial testimony, the following related events transpired prior to the meeting on July 17, 2003.

In months preceding the meeting, an investigation was launched into the propriety of Plaintiff's expenses submitted to ESI as "business related".[28]  Propelled by Broidy's direction, Giovanelli was charged to produce a comprehensive analysis detailing Plaintiff's expenses and cash advances from 1998 to present (*i.e.*, 2003).[29]  On June 22, 2003, Giovanelli produced a memorandum of his findings to Broidy and Defendant, concluding that: (1) $201,274.00 of

---

[27] Although Giovanelli reported that ESI's income statement evidenced a loss through April 30, 2003, historically ESI received most of its revenue in the third and fourth quarters.

[28] It is not entirely clear to the Court when the investigation into Plaintiff's expenses commenced.  During trial, Defendant testified that he was initially unaware of these actions taking place.  Giovanelli estimated that he was given the task of looking into Plaintiff's expenses sometime in early 2003.  Otis, on the other hand, testified that the investigation could have started as early as November or December of 2002.

[29] Giovanelli testified that Defendant was aware of the investigation from the beginning.

submitted expenses were "personal" and not allowable business expenses pursuant to the enumerated criteria in Plaintiff's current employment contract; and (2) there was an outstanding amount of $160,372.00 in cash advances for which Plaintiff failed to submit receipts and therefore owed to ESI.  *See* Trial Ex. 12A, June 23, 2003, Memorandum from Giovanelli to Board.

On June 23, 2003, ESI's Board (*i.e.*, Defendant and Broidy) received a report from Minyard & Associates ("Minyard"), an outside accounting firm retained by ESI to independently review Plaintiff's expenses.  *See* Trial Ex. 13, June 23, 2003, Minyard Report to ESI Board. Closely mirroring Giovanelli's memorandum, Minyard found that Plaintiff received reimbursement for "non-business related expenses" approximating $200,000.00 and, regarding Plaintiff's cash advances, should have submitted receipts for approximately $158,000.00, as that amount remained "undocumented."   According to Minyard, these discrepancies resulted in "monetary injury" to ESI and were a violation of Plaintiff's employment contract.

Minyard also sent a subsequent, updated report to Robert Scapa ("Scapa")[30] on June 30, 2003, wherein Giovanelli's memorandum was called a "reliable representation of facts."  *See* Trial Ex. 12B, June 30, 2003, Letter from Minyard to Scapa.  This letter concluded: (1) that *at least* $201,274.47 reimbursed by ESI to Plaintiff were for personal expenses; (2) that Plaintiff was required to repay, or produce receipts for, $160,371.97 of advanced cash funds; and (3) that $39,315.30 worth of receipts submitted by Plaintiff purportedly detailing use of the advanced cash funds for business purposes were "misclassified" and owing to ESI.

On July 3, 2003, Giovanelli drafted a "personal and confidential" memorandum to

---

[30] Scapa was Defendant's personal attorney from California.  Scapa was asked by either Broidy or Defendant to provide advice regarding the investigation into Plaintiff's expenses and the potential legal ramifications stemming therefrom.

Defendant and Broidy describing the effect Plaintiff's separation would have on ESI's $5 million line of credit with Comerica Bank. *See* Trial Ex. 12C, July 3, 2003, Confidential Memorandum from Giovanelli. As mentioned, *supra*, Plaintiff was one of the guarantors of this loan. ESI was able to negotiate that loan, in large part, because of Plaintiff and his industry reputation and success. Giovanelli advised Defendant and Broidy of two outcomes, *i.e.*, a "high road" and a "low road", that could occur: (1) if Plaintiff took the "high road", resulting in an amicable separation in which he announces his retirement, Comerica would be invited to Plaintiff's retirement party where Plaintiff would "publically" pass his executive baton onto Otis, verbally assert confidence in ESI's future, and indicate that his separation was a "good thing";[31] and (2) if Plaintiff took the "low road", and "fights" his separation and or removal, ESI would issue a press release saying that Plaintiff was terminated for cause, and would assure Comerica and its loan committee that removing Plaintiff was in the best interests of ESI as Plaintiff failed to properly lead the company.[32]

The foregoing set of events culminated with the July 17, 2003, meeting in Detroit, in which Plaintiff, Defendant, and Broidy were initially present.[33] Plaintiff thought the purpose of the meeting was to discuss prospective persons that would replace him as CEO. Instead, and to Plaintiff's surprise, he was handed the letter from Defendant and Broidy that challenged Plaintiff's business expenses for the previous five (5) years. In conjunction with this letter, Plaintiff also received the Minyard report discussed, *supra*. *See* Trial Ex. 13, June 23, 2003,

---

[31] Giovanelli would also meet with Tom Hoger, the Comerica loan officer who dealt with ESI, before the retirement party to formally discuss ESI's business plan going forward, and remind Hoger of the "misjudgments and missteps" over the previous five and a half (5 ½) years while Plaintiff was leading the company.

[32] Giovanelli cautioned Broidy against disclosing to Comerica any issue with Plaintiff's personal expenses as the bank might investigate Plaintiff for "material fraud."

[33] As discussed below, the July 17, 2003, meeting was conducted in a morning and an afternoon session. Plaintiff was delivered the letter in the morning session.

16

2:11-cv-12822-LPZ-RSW   Doc # 46   Filed 03/13/13   Pg 17 of 28   Pg ID 350

Minyard Report to ESI Board.  As a result of the findings in the Minyard Report, Plaintiff was placed on paid "indefinite administrative suspension" pending a final investigation.  The letter also advised Plaintiff to seek independent legal counsel.

At some time during the meeting, but after Plaintiff was given the suspension letter and Minyard report, Broidy exited the office.  Defendant then, as corroborated by Plaintiff and Defendant at trial, told Plaintiff that when ESI redeemed Defendant's shares, he would pay Plaintiff 50% of the amount he received from the redemption.  Defendant testified, however, that this statement *was contingent* on Plaintiff receiving "nothing" from ESI.[34]  Plaintiff, Defendant, and Broidy then went to lunch.

Reconvening back at Gilbride's office in the afternoon of July 17, 2003, Broidy and Scapa, who had since joined the afternoon portion of the meeting, presented Plaintiff with a Redemption, Separation and Consulting Agreement ("Separation Agreement").  *See* Trial Ex. 15F, ESI Redemption, Separation and Consulting Agreement.  Among other provisions, the Separation Agreement's terms and conditions provided as follows:

(1) ESI would redeem Plaintiff's 725,000 shares of stock at a purchase price of $1.00 per share, for a total redemption price of $725,000.00;[3536]

(2) Plaintiff would be compensated in the amount of $110,000 constituting "separation pay";

(3) Plaintiff would serve as a consultant to ESI from January 16, 2004, until

---

[34] Defendant traveled to the June 17, 2003, meeting on a private plane with Broidy and Scapa from California. Defendant testified that during the flight Broidy repeatedly indicated that he (*i.e.*, Broidy) was going to "throw" Plaintiff out of ESI and "have him arrested" due to Plaintiff's expenses.  As a result of those comments, Defendant further testified that he (*i.e.*, Defendant) believed that Plaintiff would be fired without receiving compensation and possibly arrested.  It was this belief that caused Defendant to want to give Plaintiff half of his stock proceeds. Defendant reiterated multiple times during trial that once Plaintiff agreed to the "buyout" package, he never again stated that he would give Plaintiff half of his stock proceeds.

[35] Because Plaintiff never paid the initial stock subscription price of $0.01per share, this amount was credited against the redemption price.

[36] Broidy purchased Plaintiff's redeemed shares from ESI and thus Defendant's shares did not increase in volume due to Plaintiff's separation.

17

December 31, 2006, and receive a base consulting fee of $100,000.00 per year, with the opportunity to receive additional commission fees in an amount up to $100,000.00 if Plaintiff delivered certain client accounts;

(4) If Plaintiff accepted the Separation Agreement, he would contemporaneously execute a promissory note payable to ESI in the amount of $389,143.00, representing Plaintiff's outstanding officer loans due and owing to ESI—yet, if Plaintiff complied with the terms, covenants and conditions of the Separation Agreement, ESI would forgive this loan in accordance with a pre-determined amortization schedule, with the loan being fully discharged as of December 31, 2013;

(5) If Plaintiff signed the Separation Agreement, that would signify his agreement that approximately $266,763.00 remained in dispute regarding his expenses and cash advances, and Plaintiff would be afforded an opportunity to submit to Stover— who's decision on this matter would be definitive—any documentation that may substantiate those expenses and cash purchases as "necessary" business expenses;

(6) Plaintiff would maintain the terms of the Separation Agreement on the "strictest confidence";

(7) Plaintiff would not compete in the industry until January 15, 2008;

(8) Plaintiff would agree to a mutual release provision, whereby ESI and Plaintiff, save for a few exceptions, released each other and "their respective shareholders, directors, officers, attorneys, agents, heirs, personal representatives, successors, and assigns, from any and all claims or causes of action whatsoever . . . which relate in any way to the Shares, employment with [ESI], the redemption of the Shares . . . , or otherwise relating to [Plaintiff's] relationship to [ESI] . . ."; and

(9) If Plaintiff wished to revoke the Separation Agreement after signing it, he was required to do so within seven (7) days after execution.

After receiving the Separation Agreement, Plaintiff retained George Malis ("Malis") as independent legal counsel.  Plaintiff reviewed his options with Malis on the evening of July 17, 2003.  On July 18, 2003, Plaintiff returned to Gilbride's office and, along with Malis and Otis, signed the Separation Agreement.   Pursuant to its terms, Plaintiff had seven (7) days, or until

July 25, 2003, to revoke the Separation Agreement.[37]  Upon entering the Separation Agreement, Plaintiff was also divested of his ownership interests/shares and board positions in ES3 and ClearDrive.[38]  *See* Trial Ex.'s 15K–P, 16, Documents evidencing Plaintiff's divestiture from ES3 and ClearDrive.   Tom McAlear, a former automotive executive, became CEO of ESI immediately after Plaintiff's separation.

### c. ESI AFTER PLAINTIFF'S SEPARATION

During ESI's Board meeting on January 7, 2004, it was announced by Otis that 2003 proved to be financially lucrative for the company.  *See* Trial Ex. 22B, January 7, 2004, Minutes from Board Meeting.  As a consequence, ESI shared its success with its Board, executives, and employees.  Defendant and Broidy each received distributions in the amount of $500,000.00.  The executives of the company were awarded bonuses, on average, from approximately $17,000.00 up to $40,000.00.  Employees of ESI received nominal amounts.

On April 20, 2004, Plaintiff's Separation Agreement was amended.  *See* Trial Ex. 21A, April 20, 2004, Amendment to Plaintiff's Separation Agreement.  Stover and Giovanelli sifted through the American Express bills and a hand-written ledger produced by Plaintiff to substantiate the legitimacy of his expenses, with Stover determining that of the approximately $266,763.00 in dispute regarding Plaintiff's expenses, $23,991.00 was deemed personal and therefore owed by Plaintiff.  That amount was deducted from the consulting fees to which

---

[37] During trial, Plaintiff repeatedly testified that he had "no other option" but to sign the Separation Agreement.  The Court finds his testimony, however, to be unpersuasive.  The suspension letter gave him the "option" to contest the expense allegations at the outset and the Separation Agreement gave him the "option" to revoke the entire agreement.  It is clear to the Court that Plaintiff made a deliberate, conscious decision to ultimately accept the Separation Agreement.

[38] Plaintiff also relinquished his ownership interest/shares and board position in Convesco, a company that was part of ESI and formed by ESI's accountants solely for tax purposes.

Plaintiff was entitled as of the amendment date of the Separation Agreement.[39]

In February of 2005, Otis, then President of ESI, traveled to California in an attempt to convince Defendant to redeem his shares in ESI.  *See* Trial Ex. 43, Stock Repurchase Proposal. Otis offered Defendant a redemption price of $7.50 per share, but no agreement was reached at that time.  Otis testified that, during this encounter, Defendant indicated to him that he (Defendant) intended to "take care of Preston down the road."  Defendant disputes that testimony, claiming that he did not make any representations to Otis about Plaintiff.

Eventually, on July 5, 2005, ESI redeemed Defendant's stock at a price of $3.50 per share.[40]  *See* Trial Ex. 24A, July 5, 2005, Stock Purchase Agreement between ESI and Defendant.  Defendant's agreement also contained a confidentiality provision that precluded Defendant from discussing the terms and conditions of this agreement.  Giovanelli also had his stock redeemed at a price of $3.50 per share when he was terminated from ESI in December 2005.

At some point in late 2005 and into early 2006, Plaintiff became apprised that Defendant's stock was redeemed.  Thereafter, Plaintiff and Defendant met twice—first in California and then in Detroit—and during those encounters—as well as on other occasions between July 2003 and early 2005—Defendant, according to Plaintiff, allegedly reiterated his statement to split the proceeds of his stock redemption with Plaintiff.  Defendant denies making such statements.

In 2006 and 2007, Plaintiff worked as President of a sales company called Autotribe,

---

[39] Though largely irrelevant to the only remaining claim before the Court, Plaintiff and Defendant exhausted countless hours during trial contesting the propriety of Plaintiff's expenses.  Based on this, it appears both parties believed that they were trying a wrongful termination case.

[40] Though the details surrounding Defendant's final redemption price were not discussed at length during trial, testimony revealed that Broidy felt the initial price offered to Defendant by Otis, *i.e.*, $7.50 per share, was too high.

20

which was founded by Defendant and Stover.  Plaintiff was compensated in the amount of $100,000.00 for the first year, and $200,000.00 for the second year.  Autotribe is no longer in operation due to the economic downturn in 2007 and 2008.

## B. CONCLUSIONS OF LAW

### 1. UNJUST ENRICHMENT

Plaintiff has alleged in his complaint that he conferred two benefits upon Defendant, retention of which is unjust or inequitable: (1) introducing Defendant to Plaintiff's business contacts for the purpose of helping Defendant's failing business; and (2) awarding Defendant a 30% ownership interest in ESI.  *See* Dkt. # 1, ¶ 32.  As a result of these inequities, Plaintiff asks that the Court order Defendant to recompense him in the amount of $1.2 million.

In order to sustain a claim of unjust enrichment under Michigan law, a plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by the defendant.  *Barber*, 202 Mich. App. at 375.  As the Michigan Court of Appeals has cautioned, there must be more than a benefit received by a defendant—a defendant "is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between two persons, it is unjust for him to retain it." *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 546 (1991).  If both elements are established, only then will the law imply a contract in order to prevent unjust enrichment.  *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 478 (2003); *see also Martin v. East Lansing School Dist.*, 193 Mich. App. 166, 177 (1992).  Importantly though, an implied contract will not lie if there is an *express contract* covering the same subject matter.  *Belle Isle*, 256 Mich. App. at 478 (emphasis added).

For the reasons that follow, the Court finds that Plaintiff has failed to prove by a

preponderance of the evidence his theory of unjust enrichment.

**a. BUSINESS CONTACTS**

Aside from the bald assertion found in Plaintiff's complaint and his few passing statements made at trial, Plaintiff presented no evidence whatsoever to prove that Plaintiff introduced Defendant to his business contacts as a way to assist Defendant's failing business. Defendant vehemently denied that his business was insolvent and, as support, offered to the Court a financial statement from 1997–1998 that illustrated otherwise.[41]  *See* Trial Ex. 35, Personal Financial Statement of Defendant.  If anything, and even acknowledged by Plaintiff, Plaintiff and Defendant were involved in a "mutually beneficial relationship", with each benefiting from business contacts and services extended among themselves and their respective companies and or employers.  Thus, to the extent Plaintiff is claiming that introduction of his business contacts was unjustly conferred on Defendant, the Court denies his claim.

The Court will now address Plaintiff's argument that his granting Defendant the 30% interest in ESI constituted unjust enrichment.

**b. OWNERSHIP INTEREST IN ESI**

Most fatal to Plaintiff's argument that Defendant unjustly received and retained a 30% ownership interest in ESI is the existence of an express contract governing the issuance and distribution of ESI shares.  Admitted by Plaintiff at trial, the parties—Plaintiff, Defendant, and Broidy—unequivocally agreed at Broidy's office to equally divide 90% of ESI, with each of them acquiring a 30% ownership interest.  As the trial progressed, Plaintiff never disputed that an ownership agreement was reached and, in fact, when asked by counsel during direct

---

[41] Defendant testified that, between 1996 and 1997, his company, Budget Rental Car, obtained $25 million in sales and realized $2 million in profits.

examination if the division of interests was acceptable, Plaintiff replied, "It was."  Even further, Plaintiff, a member of the Board, was a signatory to the minutes of a later-dated ESI Board meeting wherein the Board unanimously approved the distribution of shares in accordance with Plaintiff, Defendant, and Broidy's oral agreement.  *See* Trial Ex. 39, *supra*.  Michigan law is firmly settled that a contract will not be implied—and thus an unjust enrichment claim cannot be maintained—if there is an express contract governing the same subject matter.  *See Scholz v. Montgomery Ward & Co.*, 437 Mich. 83, 93 (1991); *see also Belle Isle*, 256 Mich. App. at 478. Here, it is undisputed that an express contract governed Plaintiff, Defendant, and Broidy's ownership interests in ESI.  As such, Plaintiff's unjust enrichment claim must fail as a matter of Michigan law.

Second, notwithstanding that Plaintiff's claim is barred for the reasons set forth above, Plaintiff cannot satisfy the first element necessary for a claim of unjust enrichment, *i.e.*, the receipt of a benefit by the defendant from *the plaintiff*.  *See Barber*, 202 Mich. App at 375 (emphasis added).  Plaintiff's theory is that *he* conferred the 30% ownership interest (*i.e.*, the alleged benefit) onto Defendant.  The Court disagrees.  When Plaintiff, Defendant, and Broidy entered into the express agreement to divide the stock, they were not acting in their individual capacities—rather, they were contracting as ESI Board members and agents of ESI.  Likewise, when this agreement was later memorialized in the minutes from the ESI Board meeting, Plaintiff, Defendant, and Broidy each signed the minutes as a "Director".  Because ESI, and more specifically, the Board, conferred upon Defendant the 30% ownership interest, the Court finds Plaintiff's unjust enrichment claim without merit and dismisses said claim as defective.

Last, assuming for the sake of argument that the express agreement was non-existent and that Plaintiff had actually conferred the 30% interest in ESI onto Defendant, Plaintiff must still

prove that Defendant's retention of that benefit results in an inequity. *See Barber*, 202 Mich. App. at 375. As Plaintiff would have it, he unjustly enriched Defendant because Defendant purportedly "paid nothing and gave nothing in exchange for [the] shares." *See* Dkt. # 1, ¶ 34. This allegation is misplaced for at least two reasons. First, Plaintiff testified during trial on more than one occasion that Defendant's actions of procuring Broidy and his capital contributions were "important" and served as justification for Defendant's receipt of the 30% interest in ESI. As an example, when asked on direction examination why Defendant deserved the 30% interest, Plaintiff testified, "He [*i.e.*, Defendant] introduced me to Mr. Broidy." Yet, confusingly, Plaintiff testified on at least one other occasion that Defendant did nothing to receive the 30% interest. Because of this conflicting testimony, it thus appears to the Court that Plaintiff cannot decide whether Defendant's 30% interest in ESI was justified or not.

Second, and irrespective of that, the evidence elicited at trial was abundantly clear in one regard—Defendant's retention of the 30% interest in ESI was far from "unjust" or "inequitable". Contrary to Plaintiff's allegation that Defendant "paid nothing and gave nothing" for his shares, the Court found numerous examples that undermine that assertion: (1) Defendant served as an uncompensated ESI Board member from 1998–2005, voting on business matters including, but not limited to, Plaintiff's compensation, Plaintiff's revolving line of credit, and ESI's Stock Buy-Sell Agreement; (2) Defendant attended all ESI annual meetings and Board meetings; (3) Defendant attended sales presentations in California on ESI's behalf; (4) Defendant paid the stock subscription price for his shares in ESI; (5) Defendant offered to co-sign a $500,000.00 promissory note to Bank of America in March of 1998 to secure financing for the BMW project; (6) Defendant introduced Plaintiff, and ESI, to Broidy; (7) Defendant served as the liaison between Broidy and ESI; (8) Defendant found and hired for ESI two accounting firms; (9)

24

Defendant found and hired Giovanelli, who served for a period of time as ESI's CFO; and (10) Defendant loaned Plaintiff at least $75,000.00, part of which was used to mount a successful legal challenge against Plaintiff's non-compete agreement with A&M.

From that list, the Court specifically highlights two related services provided by Defendant. When Plaintiff was terminated from A&M, he was staring at a two-year non-compete provision that would have barred his participation in the industry. So, taking the idea of ESI from concept to reality required a Court order striking down that provision as unenforceable. Defendant provided Plaintiff with the financial resources to hire a law firm and, ultimately, Plaintiff prevailed against A&M and the non-compete clause was declared null and void.

Additionally, because Plaintiff did not possess the capital necessary to finance a new company, Defendant introduced Plaintiff to Broidy as means to meet that end. Broidy's initial financial contribution provided ESI with startup capital and enabled it to procure event contracts. These two invaluable actions undertaken by Defendant, coupled with the others outlined above, certainly militate against Plaintiff's statement that Defendant "provided nothing" in exchange for receiving an interest in ESI. The Court finds nothing "unjust" or "inequitable" about Defendant's retention of his 30% interest in ESI and therefore Plaintiff's unjust enrichment claim is similarly barred on this ground. *See Dumas*, 437 Mich. at 546 (holding that a defendant is liable to pay for a received benefit *only* if it unjust for him to retain it).

In conclusion, Plaintiff has failed to prove by a preponderance of the evidence that he conferred any benefit upon Defendant which Defendant has unjustly or inequitably retained.

## 2. RELEASE

Defendant argued at trial that the release provision contained in Plaintiff's Separation Agreement additionally bars his unjust enrichment claim against Defendant. Paragraph 25,

2:11-cv-12822-LPZ-RSW   Doc # 46   Filed 03/13/13   Pg 26 of 28   Pg ID 359

subsection (h), titled "Mutual Release", of Plaintiff's Separation Agreement states in pertinent part:

> Except relating to the executory provisions of this Agreement, and paragraphs 8, 9, 10, 11 and 12 of Redeemed Shareholder's Executive Employment Agreement dated February 1, 2003, Corporation and [Plaintiff], for themselves and their officers, directors, shareholders, heirs, personal representatives and assigns, and anyone claiming by or through them, do hereby release and forever discharge each other and their respective shareholders, directors, officers, attorneys, agents, heirs, personal representatives, successors and assigns, from any and all claims or causes of action whatsoever, whether known or unknown, which relate in any way to the Shares, employment with Corporation, the redemption of the Shares hereunder, or otherwise relating to [Plaintiff's] relationship to Corporation or Corporation's business, in any manner, whether arising in contract or tort or otherwise.

*See* Trial Ex. 15F, ESI Redemption, Separation and Consulting Agreement.   According to Defendant, this provision conclusively forecloses Plaintiff from bringing his claim.

Having determined that Plaintiff's claim fails for the reasons discussed above, the Court finds it unnecessary to address the merits of this argument.   Though Plaintiff argues otherwise, when reading the language of the release provision it appears, however, that based on the inclusion of sweeping terms, such as "release and forever discharge", "any and all claims or causes of action whatsoever, whether known or unknown", and "which relate in any way", this provision was likely intended to have a broad effect.   *See Stolaruk Corp. v. Cent. Nat'l Ins. Co. of Omaha*, 206 Mich. App. 444, 450 (1994) ("The [language from the release] makes it clear that Stolaruk and Strada executed a release covering all known, *unknown*, then existing, or future causes of action.   Hence . . . it is clear that the release encompassed all present or future causes of action whether known or unknown.") (interpreting release provision similar to the instant case).

As mentioned, because Plaintiff's remaining claim fails independent of the Court

26

definitively ruling on the applicability of the release provision, the Court will refrain from considering Defendant's argument here.

### 3. PLAINTIFF'S PREVIOUSLY-DISMISSED CLAIMS

As discussed in Part II.A, *supra*, the Court dismissed counts I and II of Plaintiff's complaint (breach of contract and breach of implied contract, respectively) on November 30, 2011, because "Plaintiff's assertions that introducing Defendant to business contacts and approving Defendant's 30% interest in ESI in 1998 [were not] valid consideration for an alleged oral promise" to pay Plaintiff half of Defendant's stock redemption proceeds. *See* Dkt. # 13, pp. 15–16. The Court found Defendant's statement to be merely gratuitous and, if Plaintiff's actions constituted consideration at all, they would be deemed "past consideration", and thus "not sufficient legal consideration", for a later executed agreement. *See id.* at p. 15. *See also Shirey v. Camden*, 314 Mich. 128, 138 (1946).

Nothing introduced by way of testimony or exhibits at trial or conclusively determined by the Court in its finding of facts would cause the Court to question the propriety of dismissing Plaintiff's contractual claims. The Court still views Defendant's statement as gratuitous and unsupported by sufficient legal consideration to form a binding contract, either express or implied. That conclusion is further bolstered by having determined that Plaintiff *did not*, in his individual capacity, approve Defendant's ownership interest in ESI and that Plaintiff and Defendant's business relationship was *mutually beneficial*. Thus, the bases of Plaintiff's contractual claims, *i.e.*, that the alleged introduction of business contacts and the alleged approval of Defendant's interest in ESI constituted consideration, are flawed and cannot support the conclusion that any type of contract was formed. Accordingly, because Plaintiff cannot prove that he offered anything in exchange for Defendant's alleged statement, and because his alleged

consideration of business contacts and approval of interest—even if true—embodies past consideration, dismissal of counts I and II of Plaintiff's complaint was proper.

## IV. CONCLUSION

For the above reasons, and upon reviewing all of the evidence, and observing the witnesses at trial, the Court HEREBY GRANTS Judgment in favor of Defendant and against Plaintiff.

IT IS SO ORDERED.

<u>s/Lawrence P. Zatkoff</u>
Hon. Lawrence. P. Zatkoff
U.S. District Judge

Dated:  March 13, 2013